UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
NORTHERN DIVISION

| | | |
|---|---|---|
| SD VOICE and Cory Heidelberger, | ) | |
| | ) | |
| Plaintiffs, | ) | Civ. 1:19-cv-1017-CBK |
| | ) | |
| v. | ) | |
| | ) | |
| South Dakota Governor Kristi L. Noem, | ) | |
| in her official capacity, South Dakota | ) | |
| Attorney General Jason Ravnsborg, in | ) | |
| his official capacity, and South Dakota | ) | |
| Secretary of State Steve Barnett, in his | ) | |
| official capacity, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**Amended Complaint for Permanent Injunction**

## Parties

1.     SD Voice is a grassroots ballot question committee, registered with the State of South Dakota, which is dedicated to supporting ballot measures that strengthen democracy and opposing ballot measures that weaken it.

2.     Cory Heidelberger is a resident of Aberdeen, South Dakota, who operates SD Voice and shares its goals.

3.     SD Voice and Heidelberger regularly circulate citizen petitions, and have a practical, concrete, compelling, constitutional interest in regaining the rights unlawfully taken from them by South Dakota's unconstitutional House Bill 1094 in 2019, effective July 1, 2020.

4.     Kristi L. Noem is the Governor of South Dakota and is sued in her official capacity.

5.     Jason Ravnsborg is the Attorney General of South Dakota and is sued in his official capacity.

6.     Steve Barnett is the Secretary of State of South Dakota and is sued in his official capacity.

7.     Defendants are charged with enforcing HB 1094, and unless restrained, will act together to enforce it.

2

## <u>Jurisdiction</u>

8.      This action is brought pursuant to 42 U.S.C. § 1983 and 42 U.S.C. § 1985(3).  This Court has jurisdiction under 28 U.S.C. § 1331 and 28 U.S.C. § 1343(3).

## <u>Facts</u>

9.      "The right of initiative is very important in states like South Dakota where the dominant political party controls, and has for 26 years, the office of the governor, the state House and the State Senate."  *SD VOICE v. Noem*, 2019 U.S. Dist. Lexis 78244 * 18 (D.S.D., No. Div.)

10.     South Dakota Initiated Measure 24 was an unconstitutional attempt to "enact restrictions . . . to prevent those pursuing unpopular laws from amassing the resources necessary for effective advocacy."  *Id.* at 19.

11.     Mark Mickelson, while he was the Republican Speaker of the South Dakota House of Representatives in 2017 and 2018, organized, circulated, and promoted IM 24.

12.     Republican Governor Dennis Daugaard wrote the published "pro" statement in support of IM 24 in 2018, which castigated "out-of-state interests"—including those from Massachusetts and California—for promoting their ideas in South Dakota.  *Id.* at 3 to 4.

3

13.     After Mickelson and Daugaard organized and promoted IM 24's unconstitutional attempt to burden the promotion of ideas they disfavor from being presented to South Dakota voters through the initiative process in 2018, their party organized, promoted, and enacted House Bill 1094 in 2019, for the same purpose.

14.     Republican Rep. Jon Hansen of Dell Rapids, sponsor of House Bill 1094, said that existing South Dakota petition law is being "trampled on" to attempt to bring "California and Massachusetts liberal agendas" to South Dakota.

15.     Hansen also said he believes that Cory Heidelberger does not like House Bill 1094 because it keeps away Heidelberger's "out-of-state liberal allies."

16.     Both statements by Hansen were published in an Associated Press article that ran in the Rapid City Journal on June 19, 2019, at page A5, and in other newspapers in South Dakota.

17.     HB 1094 imposes substantial unwarranted new restrictions on the ballot measure process, for the purpose of further consolidating power in South Dakota's dominant political party, by making it far harder for disfavored speakers to place ballot measures before the voters, and by attempting to control the content of ideas from which voters may choose.

18.     HB 1094 is content-based discrimination against disfavored speech.

19.     HB 1094 was enacted to curtail the success citizens have had in recent years enacting laws through the ballot initiative process that are disfavored by South Dakota's dominant political party.

20.     The fact that both former Governor Daugaard, in his ballot statement supporting IM 24, and Representative Hansen, in his statements to the press, cited Massachusetts and California as states whose ideas they want to keep out of South Dakota was neither a coincidence nor an accident.

21.     Massachusetts is the home of "Represent Us," the primary sponsor of Initiated Measure 22, an ethics-in-state-government measure that South Dakota voters enacted in November, 2016, which displeased South Dakota's dominant political party so much that when the Legislature convened in January, 2017, it promptly repealed the law.

22.     California is the home **of** Henry Nicholas, the sponsor of "Marsy's Law," a successful victim's rights constitutional amendment that displeased South Dakota's dominant political party.

23.     In addition to Initiated Measure 22 and "Marsy's Law," the ballot measure process has been actively used in South Dakota by citizens seeking to enact

5

or repeal state laws, so it is an actual, practical, real, working source of citizen speech and actual citizen direct participation in the political process.

24.     Recent examples of the citizen democratic process at work through ballot measures that voters enacted include:

    A.     In 2016, Initiated Measure 21 capped the payday loan interest rate at 36%. https://ballotpedia.org/South_Dakota_2016_ballot_measures (last visited July 18, 2019).

    B.     In 2014, Initiated Measure 18 raised the minimum wage from $7.25 to $8.50 and provided for a yearly increase based on inflation.   https://ballotpedia.org/South_Dakota_2014_ballot_measures (last visited July 18, 2019).

    C.     Also in 2014, Initiated Measure 17 allowed patients to choose their health care provider at no increased cost.  *Id.*

25.     These Initiated Measures are "liberal" initiatives—or at least more "liberal" than South Dakota's dominant political party favors—and thus they are examples of the type of citizen speech and direct participation in the political process that  HB 1094 targets.

6

26.     This lawsuit seeks a permanent injunction against the enforcement of HB 1094, now codified into South Dakota law.

### First Cause of Action— ### Discrimination against disfavored speakers

27.     All paragraphs above are incorporated herein by this reference.

28.     "[T]he Supreme Court specifically held that the First Amendment prohibits the government from imposing restrictions on the political speech of certain disfavored speakers."  *SD VOICE v. Noem*, *supra* at * 13.

29.     "We find no basis for the proposition that, in the context of political speech, the Government may impose restrictions on certain disfavored speakers. Both history and logic lead us to this conclusion."  *Citizens United v. FEC*, 558 U.S. 310, 341 (2010).

30.     All the restrictions and prohibitions in HB 1094 affect *only* citizen ballot campaigns—they have no effect on candidates, candidate committees, political action committees, or political parties.

31.     So HB 1094's purpose and effect is to burden only citizen ballot campaigns, not candidates, candidate committees, political action committees, or political parties.

32.     In this respect, HB 1094 is exactly like IM 24, in which "The prohibition on receipt of out-of-state contributions applie[d] only to ballot question committees. No restriction on out-of-state contributions applie[d] to candidates or candidate committees, political action committees, or political parties." *SD VOICE v. Noem, supra* at * 5.

33.     In addition, SD VOICE, Heidelberger, and all other people in and out of South Dakota whose ideas are perceived as "liberal" are disfavored speakers unlawfully targeted by HB 1094 based on the content of their speech, which displeases the dominant political party in South Dakota.

34.     Every burden on speech imposed by HB 1094 is subject to strict scrutiny and is constitutional only if the State "prove[s] that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest." *SD VOICE v. Noem, supra* at * 10, quoting *Citizens United v. FED, supra*, 558 U.S. at 340.

35.     HB 1094 does not further any compelling state interest, nor is it narrowly tailored to achieve any such interest.

36.     HB 1094 is a heavy-handed attempt to burden and restrict citizen speech in citizen initiatives so that such initiatives become difficult or impossible to

8

bring, thus limiting citizen speech so that it cannot effectively challenge the ideas, goals, and philosophy of South Dakota's dominant political party.

37.     HB 1094 burdens only petition proponents, not petition opponents, because petition proponents are subject to onerous requirements that do not apply to petition opponents.  So HB 1094 unconstitutionally targets only proponents of change, while leaving advocates of the status quo—which is determined by South Dakota's dominant political party—unfettered.

38.     HB 1094's discrimination against disfavored speakers, petition proponents, and out-of-state speakers violates the First Amendment.

**Second Cause of Action—**
**Unconstitutional burdens on the ballot measure process**
**<u>and on the rights of citizens to be heard by signing ballot measure petitions</u>**

39.     All paragraphs above are incorporated herein by this reference.

40.     "Petition circulation, we held [in *Meyer v. Grant*, 486 U.S. 414 (1988)], is 'core political speech,' because it involves 'interactive communication concerning political change.'  First Amendment protection for such interaction, we agreed, is 'at its zenith.'"  *Buckley v. Am. Constitutional Law Found.*, 525 U.S. 182, 186-87 (1999) (internal citations omitted).

9

41.     HB 1094, codified as SDCL 2-1-1.5, requires extensive, unnecessary, and burdensome information from each petition circulator—and then voids all voters' signatures if the circulator has made a totally innocent, irrelevant error in any part of a variety of information the circulator is required to submit—and includes a seven-day updating requirement.

42.     The voiding of all voters' signatures for any circulator's innocent error in the extensive information that the circulator must submit, with a seven-day updating requirement, violates the rule that any burden on "a political party, an individual voter, or a discrete class of voters . . . must be justified by relevant and legitimate state interests sufficiently weighty to justify the limitation." *Crawford v. Marion County Election Bd.*, 553 U.S. 181, 191 (2008), quoting *Norman v. Reed,* 502 U.S. 279, 288-89 (1992).

43.     SDCL 2-1-1.5 requires petition circulators to submit a wide variety of information about themselves to the secretary of state.  Specifically, it requires:

A.     "Prior to the circulation of any petition for a ballot measure, a petition circulator shall submit an application to the secretary of state, obtain a circulator identification number, and be included in a directory of registered petition circulators.  For *each* ballot

10

measure on which a petition circulator seeks to circulate a petition, the petition circulator shall certify the circulator's name, that the circulator is at least eighteen years of age, physical address of current residence, physical address of prior residence if current residence is less than one year, email address, phone number, state of issuance for driver license, state of voter registration, occupation, the ballot question committee supporting the ballot measure, whether the petition circulator will be volunteer or paid, and whether the petition circulator is a registered sex offender." (emphasis added)

B.     Then it provides: "If *any* statement included in the petition circulator's certification is determined to be false, any signatures collected by the petition circulator are void and may not be counted."  (emphasis added)

C.     The statute includes no *mens rea* requirement for the "false" statement, and no "substantial compliance" exception—so a totally innocent, irrelevant error by the circulator would invalidate the signature of every voter who signed the petition.

11

D.   In addition, the statute provides: "A petition circulator *and* petition sponsor shall update any information required under this section with the secretary of state not more than seven days of [sic] any change." (emphasis added) So a totally innocent, irrelevant failure to update information within seven days of any change, by either the petition circulator *or* the petition sponsor, would invalidate the signature of every voter who signed the petition.

44.   The requirement that this information must be submitted separately for each ballot measure for which the circulator seeks to submit a petition has no legitimate purpose—and even if it had one, it would not be narrowly tailored to that purpose.

45.   The rule that "Any statement" that is "false"—no matter how meaningless, insignificant, or innocent—voids all signatures collected is a draconian and unjustified remedy that is intended to and does create a barrier for petition sponsors and, if allowed to take effect, will eliminate voter signatures on a petition for no good reason.

12

46.     SDCL 2-1-10 already contains requirements that safeguard the initiative process, backed by the criminal sanction for perjury (SDCL 32-3-19), a Class 6 felony punishable by two years' imprisonment.

47.     Specifically, SDCL 2-1-10 already requires that:

A.     "[E]ach petition circulator shall sign a verification attesting that the circulator personally circulated the petition, and is not attesting to any signature obtained by any other person;

B.     "[T[hat the petition circulator is a resident of South Dakota;

C.     "[T]hat the circulator made reasonable inquiry and, to the best of the circulator's knowledge, each person signing the petition is a qualified voter of the state in the county indicated on the signature line;

D.     "[T]hat no state statue regarding the circulation of petitions was knowingly violated."

E.     And that "[t]he circulator's signature on the verification shall be witnessed and notarized by a notary public commissioned in South Dakota or other officer authorized to administer oaths pursuant to SDCL18-3-1."

13

48.     The final paragraph of 2-1-1.5 requires that a petition circulator and petition sponsor "shall update any information required under this section with the secretary of state not more than seven days of any change."

49.     So if any such change (e.g. circulator's address, phone number, e-mail address, etc.) is not submitted by the petition circulator *and* the petition sponsor within seven days, all signatures collected are void.

50.     This is even worse, because a circulator and sponsor who complied with all requirements could find that all the signatures collected are invalid because at some future time, the circulator changed her phone number or any other piece of information the circulator was required to submit, and she and the sponsor did not tell the state.

51.     The statute does not say how long in the future this updating requirement applies, so nothing in the law prevents it from being applied until the election occurs, months after the circulator collected signatures.

52.     In addition, all this information is required before collecting signatures, so it is a prior restraint on circulator and voter speech.

14

53.     This prior restraint prevents petition sponsors and circulators from recruiting people they meet who are willing on-the-spot to take and circulate a petition from doing so.

54.     Such recruits have been a significant source of signatures for plaintiffs.

55.     On-the-spot recruitment is key to genuine grassroots engagement; burdensome paperwork and delays ensure that paid professional circulators working for big money will dominate petition circulation, removing ordinary South Dakotans further from the process.

56.     The substantial burdens on petition circulators created by requiring the submission of extensive personal information have no constitutionally justifiable purpose.

57.     HB 1094's requirements described herein violate the First Amendment.

**Third Cause of Action—**
**Unconstitutional burdens on the ballot measure process**
**<u>and on the rights of circulators by public directory of petition circulators</u>**

58.     All paragraphs above are incorporated herein by this reference.

59.     HB 1094, codified as SDCL 2-1-1.6, creates a public directory of registered petition circulators.

60.     SDCL 2-1-1.6 makes all the personal information collected under SDCL 2-1-1.5 available to the public.

61.     There is no legitimate justification for this, and it raises the opportunity for unlimited harassment of volunteers.

62.     This information is open to the public even before a circulator begins to circulate a petition, thereby giving opponents of the petition the opportunity to contact and harass prospective petition circulators before they have even begun to circulate a petition.

63.     Actual harassment related to a petition campaign sponsor occurred in South Dakota in the recent past, when Steve Hildebrand, a co-sponsor of Initiative Measure 21 in 2016 to cap the payday lending interest rate at 36%, was  harassed when political opponents of the measure hired dozens of homeless people  to come into his place of business, Josiah's Coffeehouse & Café in Sioux Falls, to attempt to wreck his business.

64.     *Buckley v. Am. Constitutional Law Found.*, 525 U.S. 182 (1999), holds that Colorado could not constitutionally require petition circulators to wear nametags because "circulators had legitimate fears of retaliation in connection with giving out their name to the public."

16

65.    SDCL 2-1-1.6 goes far beyond the requirements held unconstitutional in *Buckley*.

66.    Worse, SDCL 2-1-1.8 and 2-1-1.9 require circulators to wear mandatory badges with a circulator identification number that gives the public access to every circulator's personal information.

67.    Every petition circulator must wear a "petition circulator" badge for each petition circulated.  Sometimes Heidelberger has carried as many as four petitions at a time.  Under HB 1094, if he does so again, he would have to wear four badges, thereby presenting a disconcerting jumble of information to every prospective signer.

68.    The "circulator identification number" shows up in several places in HB 1094, and in the statutes codified from it.  For example, SDCL 2-1-1.1, 2-1-1.2, and 2-1-3.1 require that a petition circulator must provide to each person who signs the petition the circulator's circulator identification number, and that the circulator's circulator identification number must be printed on each signature page of a ballot measure petition the circulator circulates.

69.   SDCL 2-1-1.9 provides that "The badge may not state the name of the petition circulator."  This is a nod to the *Buckley* rule that the state may not require a petition circulator to wear a nametag.

70.   But 2-1-1.5, 2-1-1.6, 2-1-1.8, and 2-1-1.9 are an unsuccessful attempt to create a constitutional "workaround" to the *Buckley* rule prohibiting nametags, "workaround" meaning "a plan or method to circumvent a problem."  Merriam-Webster's online dictionary, https://www.merriam-webster.com/dictionary/work-around (last visited July 25, 2019).

71.   Not only can anyone get every circulator's name from the public directory, they can get all the other information the circulator submitted to comply with 2-1-1.5, a far worse invasion of privacy and opportunity for harassment than prohibited in *Buckley*.

72.   As a petition opponent stands on the street in front a petition circulator, the opponent can obtain this information immediately from the Secretary of State's office by use of a smartphone.

73.   All these provisions violate the First Amendment.

**Fourth Cause of Action—**
**Unconstitutional restriction of speech of non-circulators**
**who "solicit petition signatures"**

74.     All paragraphs above are incorporated herein by this reference.

75.     SDCL 2-1-1.3(1) creates a "solicits petition signatures" rule by defining "petition circulator" as "a person who is a resident of this state for at least thirty days prior to registration as a petition circulator, is at least eighteen years of age, and who circulates, for pay or as a volunteer, petitions *or solicits petition signatures* from members of the public for the purpose of placing ballot measures on any statewide election ballot." (emphasis added)

76.     Under the rule of legal construction that each word of a statute is presumed to carry some meaning (or as sometimes expressed, "is presumed not to be surplusage"), the words "solicits petition signatures" *cannot refer to people who actually circulate petitions*, because those persons are already included in the definition of "petition circulator" by the other language of the statute.

77.     The "solicits petition signatures" must mean anyone who, although not a petition circulator, asks, advises, or encourages people to sign a petition.  This would include Heidelberger's blog, a newspaper columnist, a person interviewed on radio, an advocacy group that encourages people to sign a petition, anyone who

19

writes a letter to the editor of a newspaper, anyone who comments online in response to a newspaper story, and anyone who posts or responds to a comment on Facebook, Twitter, or other social media.

78.     Anyone seeking to do any of these things would need to register as a "petition circulator"—a patently unconstitutional prior and illegitimate restraint on speech, better suited to George Orwell's *1984* or Aldous Huxley's *Brave New World* than to the United States of America.

79.     SDCL 2-1-1.9 provides: "A person is guilty of a Class 2 misdemeanor if the person acts as a petition circulator without wearing a badge issued under § 2-1-1.8."

80.     So by in any manner asking, advising, suggesting, or encouraging someone to sign a petition, a person who does not actually circulate petitions, and who has not registered and obtained a badge, commits a crime.

81.     If the State contends that it would interpret or enforce SDCL 2-1-1.3(1) in a manner contrary to the plain language of the statute, then the statute is void because it is unconstitutionally vague, because it does not give anyone notice of what it means, how the State will interpret and apply it, or what conduct will subject a person to criminal prosecution for violating it.

20

82.  In  addition,  the  registration  requirement  is  content-based discrimination  it  does  not  apply  to  people  advocating  *against*  signing petitions, as South Dakota's dominant political party actively has since 2017:

A.  On  September  1,  2017,  the  "South  Dakota  GOP@sdgop" published  on  the  internet  a  letter  to  the  editor  by  Darron Wekmesiter of Mitchell, who describes himself on the internet as a  "registered  Republican"  (https://www.mylife.com/darron-werkmeister/e21952101918312)  (last  visited  July  16,  2019), discouraging  people  from  signing  ballot  petitions  at  the  South Dakota State Fair. http://dakotawarcollege.com/gop-don't-sign-on-the-line-unless-you-know-what-it-is  (last  visited  July  16, 2019).

B.  On October 3, 2017, a post by Pat Powers, who describes himself as  "[a]  long-time  Republican  South  Dakota  political  activist," https://kxrb.com/author/patpowers/ (last visited July 16, 2019), announced: "This afternoon, the South Dakota Republican Party launched a Facebook page urging caution for citizens presented with petitions for the ballot measures currently circulating for

possible inclusion on the ballot in the 2018 election cycle."
According to Powers, this was "[a]t the direction of it's [sic]
governing body, the South Dakota Republican State Central
Committee."   http://dakotawarcollege.com/sdgop-launches-
don't-sign-on-the-line-facebook-page-encouraging-education-
before-signatures/ (last visited July 25, 2019).

C.    On June 27, 2019, the South Dakota Republican Party issued a
press release under the heading "SDGOP 'Don't Sign on the
Line' effort prevents Democrat Socialist activist from halting
ballot measure reform law."   The press release states: "South
Dakota Republican Party Chairman Dan Lederman noted that
it's a positive sign that the party's educational efforts
encouraging people to know what they're signing are working."
http://southdakotagop.com/stay-informed/press-releases/sdgo
p-don't-sign-on-the-line-effort-stops-liberals-referring-new-pe
tition-protection-law-to-ballot/ (last visited July 16, 2019).

83.    The requirement thus directly restricts speech and discriminates against
disfavored speech: people supporting placement of measures on the ballot must get

state permission before doing so, but people opposing placement of measures on the ballot face no such requirement and can speak immediately, without registration, badges, or disclosure of extensive personal information about themselves to the public.

84.     This discrimination against petition circulators and in favor of their opponents shows HB 1094's intent to regulate speech and hinder citizens from placing measures on the ballot.

85.     All these provisions violate the First Amendment.

**Fifth Cause of Action—
Discriminatory and unduly burdensome
one-year pre-election requirement for filing a petition for an initiated
constitutional amendment or a petition for an initiated measure
<u>with the Secretary of State</u>**

86.     All paragraphs above are incorporated herein by this reference.

**87.     Even before HB 1094, South Dakota unlawfully discriminated against initiated constitutional amendments and initiated measures by requiring that they be filed at least one year before the next general election.**

**88.     These requirements are found in SDCL 2-1-1.1 and 2-1-1.2, both of which are effective before and after July 1, 2020.**

23

89.     These requirements prevent an initiated **constitutional amendment or an** initiated measure from being written and circulated in response to the Legislature's actions when it meets in January, February, and March.

90.     For example, for the November 2020 election, all initiated **constitutional** amendments **and initiated measures must** be filed by November 2019, so they **cannot** respond to the Legislature's actions in January, February, or March 2020, while those actions **are** still matters of the most public interest.

91.     In comparison, laws enacted by the Legislature in January, February, or March 2020 may be referred after the legislative session for votes in the November 2020 election**, and candidates may file well after the 2020 legislative session for election in November 2020**.

92.     The one-year requirement **for filing a petition for an initiated constitutional amendment or a petition for an initiated measure with the Secretary of State** (a) discourages initiated constitutional amendments and initiated measures while the subject is timely, thereby burdening "core political speech" (*Buckley v. Am. Constitutional Law Found.*, *supra*, **525 U.S. at 186**), (b) creates less speech rather than more, contrary to *Citizens United's* rule that "more speech, not less, is the governing rule," 558 U.S. at 361, and (c) discriminates against

24

**constitutional amendments and initiated measures**, compared with referrals **and candidate elections,** for no good reason.

**93**.    This unduly burdensome requirement violates the First Amendment and the Equal Protection Clause. *Libertarian Party v. Krebs*, 290 F.Supp.3d 902 (D.S.D. 2018) (late-March deadline for new political party to qualify to participate in South Dakota's election violates First Amendment and Equal Protection clauses, because established parties need not name their candidates until after the June primary).

<u>**Request for Relief**</u>

Plaintiffs request this Court to grant:

1.    A permanent injunction against defendants barring them from enforcing or threatening to enforce the unconstitutional laws described above;

2.    Plaintiffs their attorney fees and costs pursuant to 42 U.S.C. § 1988; and

3.    Such other and further relief as it deems just.

Dated: August 2, 2019          /s/ James D. Leach
James D. Leach
Attorney at Law
1617 Sheridan Lake Rd.
Rapid City, SD 57702
Tel: (605) 341-4400
Fax: (605) 341-0716
jim@southdakotajustice.com
Attorney for Plaintiffs