UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
NORTHERN DIVISION

| | |
|---|---|
| SD VOICE, CORY HEIDELBERGER, <br><br> Plaintiffs, <br><br> vs. <br><br> KRISTI L. NOEM, GOVERNOR OF SOUTH DAKOTA, IN HER OFFICIAL CAPACITY; JASON RAVNSBORG, ATTORNEY GENERAL OF SOUTH DAKOTA, IN HIS OFFICIAL CAPACITY; AND STEVE BARNETT, SECRETARY OF STATE OF SOUTH DAKOTA, IN HIS OFFICIAL CAPACITY; <br><br> Defendants. | 1:19-CV-01017-CBK <br><br> MEMORANDUM OPINION AND ORDER |

Plaintiffs filed this lawsuit seeking a permanent injunction against the enforcement of South Dakota House Bill 1094 ("HB 1094"), which was enacted by the Legislature during the 2019 legislative session and signed by the Governor on March 21, 2019. HB 1094 amends certain provisions of the South Dakota Code and establishes a new set of regulations that apply to the proponents of ballot initiative campaigns. Plaintiffs claim, *inter alia*, that HB 1094 violates the First Amendment to the United States Constitution. A court trial on the merits of this case was held on December 9, 2019.

## DISCUSSION

The South Dakota Constitution expressly reserves to the electorate the rights to initiative and referendum. S.D. Const. art. III, § 1. To place an initiative on the ballot, South Dakota law requires that "[a]ll measures proposed by initiative shall be presented by petition. The petition shall be signed by not less than five percent of the qualified electors of the state." S.D. Codified Laws § 2-1-1. This provision by necessity requires the sponsors of ballot initiatives to petition the public, attempting to convince eligible voters to sign said petition. Let me say at the outset that judges must very carefully

approach constitutional questions as to whether an act of a legislative body should be struck down. In our system of government, this is known as judicial restraint. I approach the issues in this case with that frame of mind.

HB 1094's primary purpose is to severely regulate the process through which those who wish to circulate a petition may do so. It is entitled, "An Act to revise certain programs regarding transparency of the petition circulation process." HB 1094. It is composed of eleven sections. This case is primarily concerned with Section 1, Section 3, and Section 4.

Section 1 defines certain terms that relate to the application of the other sections. The most important of those definitions is that of "petition circulator," defined as:

> a person who is a resident of this state for at least thirty days prior to registration as a petition circulator, is at least eighteen years of age, and who circulates, for pay or as a volunteer, petitions or solicits petition signatures from members of the public for the purpose of placing ballot measures on any statewide election ballot.

South Dakota HB 1094, Section 1(1), https://sdlegislature.gov/docs/legsession/2019/Bills/HB1094ENR.pdf (last accessed December 23, 2019).

Section 3 is the primary regulating framework that would apply to petition circulators and persons who solicit petition signatures. It establishes a strict regulatory framework with which anyone meeting Section 1(1)'s broadened definition of a petition circulator must comply. Regulated individuals must submit an application to the Secretary of State and obtain an ID number. The application must contain the following information:

> For each ballot measure on which a petition circulator seeks to circulate a petition, the petition circulator shall certify the circulator's name, that the circulator is at least eighteen years of age, physical address of current residence, physical address of prior residence if current residence is less than one year, email address, phone number, state of issuance for driver license, state of voter registration, occupation, the ballot question committee supporting the ballot measure, whether the petition circulator will be volunteer or paid, and whether the petition circulator is a registered sex offender.

2

Id. at Section 3. There are also strict compliance requirements and penalties included in HB 1094, Section 3:

> The certification under this section shall be submitted to the office of the Secretary of State. If any statement included in the petition circulator's certification is determined to be false, any signatures collected by the petition circulator are void and may not be counted. Petition sponsors shall provide a list to the Secretary of State of any person acting as a petition circulator for the sponsor's ballot measure, whether the petition circulator is paid or volunteer and, if paid, the rate of compensation.

Id. Section 3 is the most significant section as pertains to this lawsuit. It is the primary burden placed on "petition circulators," as defined in Section 1, and it is the most significant regulatory change delivered by HB 1094.

Section 4 creates the directory described in Section 3 that will reflect information collected through that framework. The directory must be developed and maintained by the Secretary of State to be made "available upon request and payment of reasonable fees." Id. at Section 4. A person who requests access to the directory will receive all of the petition circulator information collected pursuant to Section 3 of the Act, as well as certain information pertaining to the ballot measure itself and the petition sponsors.

HB 1094 is scheduled to take effect on July 1, 2020.

Plaintiffs argue that HB 1094 is unconstitutional on its face as it violates the First Amendment. It is asserted that HB 1094 discriminates based on viewpoint, violates established Supreme Court precedent regarding disclosure laws, is substantially overbroad, vague, and cannot be properly severed. Each challenge will be addressed in turn.

I.

The Supreme Court's descriptions of its doctrine of viewpoint discrimination have not remained perfectly consistent throughout time, but at the core of the doctrine is the precept that "[i]n the realm of private speech or expression, government regulation may not favor one speaker over another." Rosenberger v. Rector & Visitors of Univ. of Virginia, 515 U.S. 819, 828 (1995), citing Members of City Council of Los Angeles v. Taxpayers for Vincent, 466 U.S. 789, 804 (1984). Rosenberger went on to explain that

3

"[w]hen the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant. Viewpoint discrimination is thus an egregious form of content discrimination. Id. at 829. "Because '[s]peech restrictions based on the identity of the speaker are all too often simply a means to control content,' Citizens United v. Federal Election Comm'n, 558 U.S. 310, 340 (2010), we have insisted that 'laws favoring some speakers over others demand strict scrutiny when the legislature's speaker preference reflects a content preference." Reed v. Town of Gilbert, Ariz., 135 S. Ct. 2218, 2230 (2015), quoting Turner Broad. Sys., Inc. v. F.C.C., 512 U.S. 622, 658 (1994).

In the instant case, it is speech based on the perspective of the speaker that is in jeopardy. The Court has specifically noted that "[t]he government must abstain from regulating speech when the specific . . . perspective of the speaker is the rationale for the restriction." Rosenberger, 515 U.S. at 829 (internal citations omitted). HB 1094 specifically applies a burden to the speech of those who "solicit" others to sign ballot measure petitions, but not those who solicit them not to do so. The disfavored perspective in the instant case is that of individuals seeking to place a ballot measure on a statewide election ballot, because in soliciting others to sign the petition they become burdened by HB 1094. Those who seek to maintain the status quo, leaving all law-making matters to the legislature, will not see their speech so encumbered. The content and effect of the Act makes this discrimination unmistakable. If you favor the status quo and oppose change, you are not regulated. If you favor change of one sort or another, you are extensively regulated.

According to HB 1094, the regulatory framework of Section 3 only applies to those who fall under the definition of a petition circulator as defined in Section 1 of the Act. It is important to note, however, that Section 1(1)'s definition of a "petition circulator" also includes anyone who "solicits petition signatures from members of the public for the purpose of placing ballot measures on any statewide election ballot." HB 1094, Section 1(1). This phrase in the definition of a petition circulator is preceded by the word "or," indicating that a person described by the phrase would be considered a

"petition circulator" under HB 1094's framework without any further qualification. Thus, the question is raised: what does it mean to "solicit" signatures within the meaning of the Act?

The word "solicit" is not specially defined in the Act. "It is a fundamental canon of statutory construction that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning." Sandifer v. U.S. Steel Corp., 571 U.S. 220, 227 (2014), citing Perrin v. United States, 444 U.S. 37, 42 (1979) (internal quotations omitted).

Dictionary definitions can offer a good starting point for courts seeking to understand what meaning legislators intended by their use of a certain word. Merriam-Webster.com defines "solicit" as a verb meaning:

> 1a: to make petition, to: ENTREAT; b: to approach with a request or plea, *solicited* Congress for funding; 2: to urge (something, such as one's cause) strongly; 3a: to entice or lure especially into evil; b: to proposition (someone) especially as or in the character of a prostitute; 4: to try to obtain by usually urgent requests or pleas, *solicited* donations.

"Solicit," Merriam-Webster Online Dictionary, merriam-webster.com, https://www.merriam-webster.com/dictionary/solicit?src=search-dict-box (last accessed: December 20, 2019). Dictionary.com, which is based upon the "Random House Unabridged Dictionary" defines "solicit" similarly:

> 1. to seek for (something) by entreaty, earnest or respectful request, formal application, etc.: *He solicited aid from the minister.* 2. to entreat or petition (someone or some agency): *to solicit the committee for funds.* 3. to seek to influence or incite to action, especially unlawful or wrong action. 4. to offer to have sex with in exchange for money.

"Solicit," Dictionary.com Online Dictionary, based on the Random House Unabridged Dictionary, Random House, Inc. (2019), https://www.dictionary.com/browse/solicit?s=t (last accessed December 20, 2019).

"To choose between those competing definitions, we look to the context in which the words appear. Under the familiar interpretive canon *noscitur a sociis*, 'a word is known by the company it keeps." McDonnell v. United States, 136 S. Ct. 2355, 2368 (2016). In the context of HB 1094, "solicit" seems to take on its most common meaning:

5

to entreat, to (earnestly) request, or to ask for. That is, HB 1094 includes within its sweep those who entreat or ask that others sign a petition to place a measure on the statewide ballot.

By its use of the phrase "solicits petition signatures," HB 1094 would require anyone who speaks in-favor of a ballot measure petition or encourages or entreats people to sign said petition to register as a petition circulator with the Secretary of State and otherwise fully comply with the requirements of Section 3 of the Act. No other language in the Act modifies the phrase "solicits petition signatures." The only possible modifiers are the requirements in the definition that the solicitation must be of "members of the public" and "for the purpose of placing ballot measures on any statewide election ballot." Those provisions do little to narrow the incredible scope of the definition of petition circulator in Section 1. Perhaps "members of the public" might be said to refer only to solicitation of strangers, not ones with whom the speaker has a preexisting relationship. But even so, the terrible sweep of HB 1094 is brought into clear focus by the realization that any speaker engaging in anything more than a conversation with a preexisting acquaintance must undergo burdensome registration with the Secretary of State. It matters not that an individual does not collect a signature from the listener, nor that the speaker does not work with someone who collects signatures. The fact that a person has entreated a member of the public to sign a petition to place a measure on the statewide election ballot is enough to make them a petition circulator under the Act. What makes HB 1094 viewpoint discriminatory is the fact that only one who speaks *in-favor* of a ballot measure must comply with HB 1094's regulatory framework. One who speaks *against* the ballot measure and entreats a member of the public not to sign a petition is not similarly burdened.

To illustrate, imagine two examples. A businessman that feels strongly that the subject of a ballot measure petition should be placed on the statewide election ballot and passed because it would be good for those in his industry writes an op-ed in his local newspaper speaking strongly about the virtues of the potential ballot measure; he urges and entreats all those reading to find a petition circulator and add their name to the effort.

6

While this man has no connection with those circulating the petition, and is collecting no signatures himself, under HB 1094 he must register with the Secretary of State and comply with the burdensome disclosure requirements of Section 3 of the Act. However, had he written from the opposite perspective, had he instead spoken against the petition and entreated his readers not to sign the petition so that the measure would not be placed on the ballot, HB 1094 would not similarly burden his speech. Now imagine the similar example of a dentist who takes advantage of her captive audience of patients sitting in her chair with instruments in their mouths to extol the virtues of a ballot measure she wants placed on the statewide election ballot. She entreats each of them to find a petition circulator and sign their names to the petition. Assuming that her patients would be considered members of the public, she would have to comply with the regulatory and disclosure provisions of HB 1094. Once again, however, were she speaking against the petition, entreating her patients not to sign the petition, her speech would not be similarly burdened.

The news mediums may not have fully analyzed how this broad definition may impact opinion pages and opinions in favor of ballot issues. These examples show that no matter how big or how small, or how objectionable or how reasonable the form of the speech, those entreating others to sign a ballot measure petition must comply with a burdensome regulatory framework and those entreating others not to sign a ballot measure petition need not comply with anything of the sort. This the Legislature may not lawfully do.

It might be argued that those who seek to place a measure on the ballot are doing something qualitatively different than those who oppose placing it on the ballot. That is, those soliciting signatures are seeking to change the law and, moreover, their actions could change the law. For this reason, more government oversight and regulation is needed to ensure the process is fair and uncorrupted. Such arguments are insufficient to justify the government's blatant violation of the First Amendment. In addition, HB 1094 does not just apply to those doing something different; it does not just apply to individuals who pass around a signature sheet and actively change the law. As has been

described above, HB 1094 applies to those engaging in pure speech, but not to those engaging in pure speech from an opposing perspective. For that reason, it is viewpoint discriminatory and is unconstitutional.

It might also be argued that this broad and discriminatory definition was never intended, and that the "solicits petition signatures" was not meant to apply in a way that affected speakers based on their perspective. But such considerations cannot save discriminatory laws:

> Innocent motives do not eliminate the danger of censorship presented by a facially content-based statute, as future government officials may one day wield such statutes to suppress disfavored speech. That is why the First Amendment expressly targets the operation of the laws—*i.e.*, the "abridg[ement] of speech"—rather than merely the motives of those who enacted them. U.S. Const., Amdt. 1. "'The vice of content-based legislation ... is not that it is always used for invidious, thought-control purposes, but that it lends itself to use for those purposes.'"

Reed v. Town of Gilbert, Ariz., 135 S. Ct. 2218, 2229 (2015), quoting Hill v. Colorado, 530 U.S. 703, 743 (2000) (SCALIA, J., dissenting). The South Dakota Legislature has directly attempted to burden the speech of those who seek to usurp some of its lawmaking authority, as plaintiffs contend. This is obvious and, as the finder of fact, I so find. HB 1094 is viewpoint discriminatory and strict scrutiny must be applied.

Strict scrutiny "requires the [g]overnment to prove that the restriction 'furthers a compelling interest and is narrowly tailored to achieve that interest.'" Citizens United, 130 S. Ct. at 898 (quoting FEC v. Wis. Right to Life, Inc., 551 U.S. 449, 464 (2007). The state contends in this case that the purpose of HB 1094 is essentially two-fold: (1) administrative efficiency, who performed what functions, how they might later be found if the process were to be challenged and (2) "to ensure compliance with various facets of South Dakota law, such as verification of a petition circulator's residency within the state of South Dakota, age, and sex offender status." Doc. 23 at 7-8.

The government interests in efficient administration and ensuring compliance with its laws are certainly important ones. No government could function if its laws were

8

being routinely flouted and its administration was unmanageable. But there is no evidence of any significant past problems.

The state put on extensive testimony at trial concerning the administrative difficulties that the ballot measure process places on the Secretary of State's office. The office is not especially large, and it clearly has a very important job to do. That said, that the administration of the law is difficult or time-consuming does not allow for the violation of constitutional rights. Additionally, it was made clear at trial that the Secretary of State's office has always complied with the law in the past and there is no indication that ballot measure petitions were especially burdensome. Indeed, one might argue that ensuring that petition circulators (and those who speak about petitions who might consider themselves to be subject to HB 1094's regulatory framework) comply with this new and extremely detailed regulatory framework could take even more time. The Secretary of State's office would also be given the added burden of creating and maintaining a new directory and responding to outside requests from individuals wishing to access the directory. The representative of the office that testified at trial indicated that the office planned to respond to such requests in person and would not be creating an automated system. Thus, there is good reason to believe that HB 1094 will actually increase, rather than decrease, administrative burdens.

> As to the interest in ensuring compliance with South Dakota law:
> That the Government's asserted interests are important in the abstract does not mean, however, that [HB 1094's regulatory framework] will in fact advance those interests. When the Government defends a regulation on speech as a means to redress past harms or prevent anticipated harms, it must do more than simply "posit the existence of the disease sought to be cured." Quincy Cable TV, Inc. v. FCC, 768 F.2d 1434, 1455 (CADC 1985). It must demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way. See Edenfield v. Fane, 507 U.S. 761, 770–771, 113 S.Ct. 1792, 1800–1801, 123 L.Ed.2d 543 (1993); Los Angeles v. Preferred Communications, Inc., 476 U.S., at 496, 106 S.Ct., at 2038 ("This Court may not simply assume that the ordinance will always advance the asserted state interests sufficiently to justify its abridgment of expressive activity") (internal quotation marks omitted).

9

Turner Broad. Sys., Inc. v. F.C.C., 512 U.S. 622, 664 (1994). The state did not introduce any evidence at trial indicating that the ballot measure petition process was being abused or that South Dakota law had been successfully violated even a single time in connection with the petition process. There was no testimony or written evidence to that effect of any sort. Thus, the government seems to have crafted a solution to an imaginary problem.

For the above reasons, the definition of a petition circulator in HB 1094 is unconstitutional and cannot stand.

II.

A statute is also overbroad under the First Amendment and, therefore, facially unconstitutional "if it prohibits a substantial amount of protected speech." United States v. Williams, 553 U.S. 285, 292 (2008).

> For a content-neutral time, place, or manner regulation to be narrowly tailored, it must not "burden substantially more speech than is necessary to further the government's legitimate interests." [Ward v. Rock Against Racism, 491 U.S. 781, 799, 109 S.Ct. 2746, 2758 (1989)]. Such a regulation, unlike a content-based restriction of speech, "need not be the least restrictive or least intrusive means of" serving the government's interests. Id., at 798, 109 S.Ct. 2746. But the government still "may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals." Id., at 799, 109 S.Ct. 2746.

McCullen v. Coakley, 573 U.S. 464, 486 (2014).

A law seriously burdening the speech of anyone advocating that people sign a ballot initiative petition burdens substantially more speech than is necessary to meet the government's stated interests of maintaining the integrity of the ballot initiative petition process and administrative efficiency. It is key, however, that the substantial overbreadth doctrine applies only to speech regulations that are content and viewpoint neutral. As the Court has just found, HB 1094 is viewpoint discriminatory, and thus, it must be evaluated using that framework, rather than the doctrine of substantial overbreadth. If HB 1094 was facially neutral, however, it would be substantially overbroad.

10

While the plaintiffs also challenged HB 1094 on vagueness grounds, the Court does not find HB 1094 to be unconstitutionally vague. The law is not vague. It simply applies to a very large number of persons engaging in clearly defined speech, i.e. soliciting petition signatures.

III.

HB 1094, Section 3 contains the majority of the Act's regulatory framework. That framework is essentially a set of extensive disclosure provisions, laying out the information that must be turned over to the Secretary of State to be placed in a directory that will then be available to the public. "It is, in other words, a 'disclosure law,' so we review it under a legal framework known as 'exacting scrutiny.' Missouri's burden is to show, at a minimum, that the law has a 'substantial relation[ship]' to a 'sufficiently important governmental interest." Calzone v. Summers, 942 F.3d 415, 423 (8th Cir. 2019), citing Minn. Citizens Concerned for Life, Inc. v. Swanson, 692 F.3d 864, 874–75 (8th Cir. 2012). The State fails to meet that requirement.

The Supreme Court dealt with an analogous case out of the Tenth Circuit: Buckley v. American Constitutional Law Foundation, Inc., 525 U.S. 182 (1999). Buckley involved a Colorado law that restricted ballot initiatives in a manner somewhat similar to HB 1094. The Court struck down requirements that circulators (1) wear name tags, (2) disclose each month how much they were paid (if they were paid), and (3) that circulators be registered to vote in Colorado. The Court did, however, allow certain registration, time, and age requirements to stand. The registration requirement in the Colorado law required circulators to submit an affidavit along with their collected signatures asserting that the signatures submitted were genuine and containing the circulator's names and physical addresses.

The disclosure required of individual circulators in HB 1094 is very extensive and burdensome. It includes not only names and addresses, but all phone numbers (both mobile numbers and landlines), email addresses, state of voter registration, sex offender status, and that they be issued a circulator ID number. Circulators would then have to wear badges with their ID numbers printed on them. Additionally, all of this disclosure

11

must take place, and will be made publicly available, before a circulator ever begins to circulate a petition, giving opponents a long time to engage in oppressive conduct.

The ID number requirement in this case, thus, seem strikingly similar to the one at issue in Buckley. It omits the name, a clear nod to Buckley, but it requires a great deal of information that would be available immediately to anyone wishing to harass circulators, the exact harm the Supreme Court worried would so chill speech in Buckley.

At the bench trial, a witness testified that while he worked as a circulator, he was forced to withstand professional harassment and intimidation efforts by opponents of his ballot measure initiatives. Additionally, he stated that were his name and address publicly available before he had collected signatures, he would not feel comfortable engaging in the activity again.

The Buckley Court was especially concerned that requiring circulators to wear name tags would chill speech by subjecting circulators to harassment at the time they were speaking to the electors.

> The injury to speech is heightened for the petition circulator because the badge requirement compels personal name identification at the precise moment when the circulator's interest in anonymity is greatest. See 120 F.3d, at 1102. For this very reason, the name badge requirement does not qualify for inclusion among the "more limited [election process] identification requirement [s]" to which we alluded in *McIntyre.* 514 U.S., at 353, 115 S. Ct. 1511 ("We recognize that a State's enforcement interest might justify a more limited identification requirement, but Ohio has shown scant cause for inhibiting the leafletting at issue here."); see *id.,* at 358, 115 S. Ct. 1511 (GINSBURG, J., concurring). In contrast, the affidavit requirement upheld by the District Court and Court of Appeals, **which must be met only <u>after</u> circulators have completed their conversations with electors,** exemplifies the type of regulation for which *McIntyre* left room.

Buckley, 525 U.S. at 199–200 (emphasis supplied). That the affidavit requirement in Buckley was not a requirement that existed <u>before</u> circulation of a ballot initiative was very important to the Court. That affidavit requirement stands in stark contrast with HB 1094's requirement that registration be completed before circulation of the initiative or referendum begins, and that all information be updated to reflect any changes (within 7-

days of the change). In fact, the language of the bill is broad enough that updates could be required indefinitely, at least until the measure is voted on or fails.

While defendants respond that the requirement that someone wishing to access the circulator directory make a "request" and pay a "reasonable fee" will delay access to circulators' personal information in a manner compliant with Buckley, that cannot be. Because circulators must register before they begin circulating an initiative, someone wishing to harass or intimidate them could access all the information as soon as the initiative becomes known, i.e. in advance of meeting them on the street or without ever having to do so. Additionally, there is no reason that the government could not one day change how the directory is kept, making it even more easily accessible. Under HB 1094, the Secretary of State's office would be given complete discretion as to the manner the directory is kept and accessed.

These disclosure provisions place serious and draconian burdens on protected speech. While the state's interests in effective administration of the law and ensuring that its laws are followed are important, the state has ample means of doing so that would not chill speech. As the Buckley Court noted, an affidavit requirement after the fact could help to prevent fraud and ensure that circulators complied with state law while they collected signatures. A petition circulator could still be charged with perjury and the signatures thrown out if the affidavit contained known falsehoods. Maintaining a directory of currently active circulators would simply chill too much speech to be justifiable based on these state interests alone, and no evidence of fraud or corruption of the process. Indeed, at trial, the state presented none.

The directory would be available to not only those opposing the initiative process, but also to anyone seeking to use normally highly confidential information for possibly sinister purposes, such as robo-calling entities and mass-marketing organizations. South Dakota has attempted to impose on many of our own citizens enormous invasions of privacy and serious risks of being subjected to unwanted and sometimes dangerous harassment. No legitimate governmental interest permits these heavy-handed measures, noncompliance with which threatens criminal and civil penalties.

## IV.

The final issue to be considered is whether the unconstitutional provisions of HB 1094 can be severed from the larger Act, thus saving the remainder. "Severability is of course a matter of state law." Leavitt v. Jane L., 518 U.S. 137, 139 (1996). In South Dakota, severability of unconstitutional statutory provisions can be summarized thusly:

> Unconstitutional provisions of a statute may be extracted and the remainder left intact. State ex rel. Wieber v. Hennings, 311 N.W.2d 41 (S.D.1981). The "doctrine of separability" requires this court to uphold the remaining sections of a statute if they can stand by themselves and if it appears that the legislature would have intended the remainder to take effect without the invalidated section. Hogen v. South Dakota State Board of Transportation, 245 N.W.2d 493 (S.D.1976).

S. Dakota Educ. Ass'n/NEA By & Through Roberts v. Barnett, 1998 S.D. 84, ¶ 32, 582 N.W.2d 386, 394, citing Simpson v. Tobin, 367 N.W.2d 757, 768 (S.D.1985).

Whether the remaining sections can stand on their own, and whether the legislature would have enacted them without the unconstitutional sections are questions that require an examination of the statutory structure of HB 1094.

The definition of a "petition circulator" in Section 1 and the disclosure framework of Section 3 are clearly unconstitutional. Section 2 repeals the provision of current law that imposes an affidavit requirement on petition circulators. That provision, or at least its purpose, would then be replaced by the disclosure and directory provisions of HB 1094. Sections 5, 6, and 7 all relate to the administration and carrying out of Sections 1 and 3. Sections 8, 9, and 10 all amend provisions of current law. But they only do so in one respect, namely they are removing language that relates to the affidavit requirement that will be repealed when Section 2 of HB 1094 goes into effect.

In essence, the sections of HB 1094 are all intimately connected with one another. They are a complete framework that a legislature would not likely have passed without the unconstitutional provisions. Section 4 concerns the establishment of the directory to contain the disclosed information required by Section 3. It makes little sense without Section 3. As for Section 2, it is unlikely the legislature would want to repeal the affidavit requirement without replacing it with something else. Thus, Sections 2, 8, 9,

and 10 make little sense as standalone provisions. Sections 5, 6, and 7, as they relate to the administration of the new disclosure requirements and directory also have little purpose without Sections 1 and 3.

In short, the remaining sections have little efficacy as standalone provisions, and it seems highly unlikely that the legislature would have enacted them without the sections to be struck down. The remaining provisions of HB 1094 cannot be severed.

## ORDER

Based upon the foregoing,

IT IS ORDERED that judgment will enter declaring that South Dakota HB 1094 is invalid as in violation of the First Amendment of the United States Constitution.

IT IS FURTHER ORDERED that Steve Barnett, in his official capacity as Secretary of State of the State of South Dakota, Jason Ravnsborg, in his official capacity as Attorney General of the state of South Dakota, and Kristi Noem in her official capacity as Governor of South Dakota and their officers, agents, servants, employees, attorneys, and all other persons in active concert or participation with them, are permanently enjoined from carrying out, implementing, and enforcing the provisions of South Dakota House Bill 1094, in any manner whatsoever, in accordance with this Memorandum Opinion and Order.

IT IS FURTHER ORDERED that counsel for plaintiffs shall present to the Court their properly documented affidavits as to attorney fees and all costs they have incurred in connection with this law suit and resistance to South Dakota HB 1094.

DATED this 7th day of January, 2020.

BY THE COURT:

CHARLES B. KORNMANN
United States District Judge