

FILED

AUG 3 0 2021

CLERK

UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
NORTHERN DIVISION

| | |
|---|---|
| SD VOICE, CORY HEIDELBERGER, | 1:19-CV-01017-CBK |
| Plaintiffs, | |
| vs. | |
| KRISTI L. NOEM, GOVERNOR OF SOUTH DAKOTA, IN HER OFFICIAL CAPACITY; JASON RAVNSBORG, ATTORNEY GENERAL OF SOUTH DAKOTA, IN HIS OFFICIAL CAPACITY; AND STEVE BARNETT, SECRETARY OF STATE OF SOUTH DAKOTA, IN HIS OFFICIAL CAPACITY; | MEMORANDUM OPINION AND ORDER |
| Defendants. | |

This matter is once again before the Court on remand from the United States Court of Appeals for the Eighth Circuit, Doc. 68, to examine South Dakota's procedures surrounding its voter initiated constitutional amendments and initiated statutory ballot measures, which are imposed on plaintiffs as circulators and sponsors of ballot measure petitions. The question before the Court is whether the time that is allowed for petition circulation and the final submission deadline for the petition unconstitutionally burden plaintiffs' rights of free expression under the First Amendment.

## BACKGROUND

This matter was originally before the Court as a challenge to South Dakota House Bill 1094 ("HB 1094"), which amended the procedure citizens had to follow in order to place a measure on the statewide election ballot. This Court struck down the pertinent provisions of HB 1094 after a bench trial, in an opinion dated January 9, 2020. See SD Voice v. Noem, 432 F. Supp. 3d 991, 994 (D.S.D. January 9, 2020), appeal dismissed, 987 F.3d 1186 (8th Cir. 2021). Both parties appealed portions of the opinion

to the Eighth Circuit, which dismissed the case as moot after the South Dakota Legislature repealed HB 1094. The Eighth Circuit then remanded the case for consideration of plaintiff's fifth cause of action in that case.

The South Dakota Constitution expressly reserves to the electorate the rights to initiative and referendum. See S.D. Const. art. III, § 1; Brendtro v. Nelson, 720 N.W.2d 670, 683 (S.D. 2006) (holding that "the people's power [under article III, § 1 of the South Dakota Constitution] to propose measures includes the power to propose repeal of existing laws."). The South Dakota Constitution also allows for constitutional amendments by voter initiative. See S.D. Const. art. XXIII, §1. The value placed on citizen-led initiatives is clear from the State's own motto: "Under God the People Rule."

To place any initiative measure seeking a statutory change on the state-wide election ballot, initiative sponsors must collect and submit a petition containing the signatures of five percent of the total number of registered voters in the state. That petition must be circulated within a one-year period that begins no earlier than 24-months and ends no later than one-year before the general election on the ballot of which the measure will appear. SDCL § 2-1-1.2.[1] Thus, there is a one-year window to collect and submit the required number of signatures ("the circulation period"). Of course, a sponsor does not have to begin petition circulation two-years in advance of the election, but regardless of when the initiative sponsors begin to circulate their petition, the petition and all signatures must be filed no later than one-year prior to the general election ("the filing deadline").

Amending the South Dakota Constitution by initiative requires "a petition signed by qualified voters equal in number to at least ten percent of the total votes cast for Governor in the last gubernatorial election." S.D. Const. art. XXIII, §1. A petition containing the names and addresses of the amendment's sponsors and the required number of signatures must be filed at least one-year prior to the general election on the

---

[1]   In pertinent part, SDCL § 2-1-1.2 reads as follows: "For any initiated measure petition, no signature may be obtained more than twenty-four months preceding the general election that was designated at the time of filing of the full text. The initiated measure petition shall be filed with the secretary of state at least one year before the next general election." SDCL § 2-1-1.2.

ballot of which it will receive a vote.  See id.  SDCL 2-1-1.1 also imposes the requirement that no petition for a constitutional amendment may begin circulating earlier than 24-months before the election on the ballot of which it will appear for a vote.  Thus, the same one-year circulation period applies to initiatives seeking to amend the state constitution as applies to any other initiated measure.  The only difference between an initiated law and a constitutional amendment by initiative is the number of signatures required.

Once the petitions have been filed, the Secretary of State evaluates the submitted materials and determines whether the State's legal requirements have been met.  An important step taken by the Secretary is the counting and verification of a sample of the submitted signatures.  During the December 2019 bench trial, Kea Warne, then Director of Elections of the Secretary of State's office, testified that a random sample of "like, 2.3 [percent]" of collected signatures were actually reviewed by the Secretary.  Trial Transcript at 121.  Thus, the actual number of signatures reviewed by the Secretary of State's office was about 700 out of the total of about 34,000 that were collected.

Plaintiffs argue that the deadline is unduly restrictive and violates the First Amendment right of freedom of speech because it unduly burdens free expression without adequate justification.

The State's proffered interest is in administrative efficiency and election integrity. The State argues that the burden on speech that the deadline creates is incidental and justified by the State's compelling interests.

Plaintiffs challenge both the requirements of SDCL 2-1-1.2 regulating ballot measure petitions as well as the one-year filing deadline contained in S.D. Const. Art. XXIII, §1 and the further requirements of SDCL 2-1-1.1 concerning constitutional amendment by initiative.

## DISCUSSION

### I.

Petition circulation and the expression that surrounds it are each acts of expression that are considered "core political speech."  Buckley v. Am. Const. L. Found., Inc., 525

U.S. 182, 186 (1999).  And, as such, "First Amendment protection for such interaction

. . . is 'at its zenith.'"  Id. at 187.  In its next breath, the Supreme Court also stated that

"there must be a substantial regulation of elections if they are to be fair and honest and if

some sort of order, rather than chaos, is to accompany the democratic processes."  Id.

(quoting Storer v. Brown, 415 U.S. 724, 730 (1974).  Thus, courts examining regulations

of the petitioning process must balance these two competing interests, ensuring that the

Constitution is respected without making the State's administration of its elections

untenable.

It is of some interest in the context of ballot initiative campaigns to understand

that:

> [a]lthough the First Amendment protects political speech incident to an
> initiative campaign, it does not protect the right to make law, by initiative
> or otherwise. In *Save Palisade FruitLands v. Todd,* 279 F.3d 1204, 1208
> (10th Cir.2002), [the Tenth Circuit] considered a free speech challenge to a
> Colorado law that allowed the citizens of "home rule" counties to initiate
> legislation, but did not extend that right to citizens of "statutory" counties.
> [The Circuit Court] held that "the right to free speech . . . [is] not implicated
> by the state's creation of an initiative procedure, but only by the state's
> attempts to regulate speech *associated with* an initiative procedure." *Id.* at
> 1211 (emphasis added).

Initiative & Referendum Inst. v. Walker, 450 F.3d 1082, 1099 (10th Cir. 2006).  The

Eighth Circuit has similarly held that the First Amendment has nothing to say about a

state choosing to make it more difficult to change law using ballot initiatives.  The only

concern of the First Amendment is the regulation of speech itself.  See Wellwood v.

Johnson, 172 F.3d 1007, 1009 (8th Cir. 1999) (holding that an Arkansas law that

increased the number of signatures required on initiative petitions for local-option

elections but not for initiatives of any other sort did not violate the First Amendment

because making it more difficult to place a measure on the ballot does not, without more,

restrict upon speech.); Dobrovolny v. Moore, 126 F.3d 1111, 1112 (8th Cir. 1997), *cert.

denied,* 523 U.S. 1005 (1998) (Holding "that the appellants' inability to know in advance

the exact number of signatures required in order to place their initiative measures on the

ballot" did not infringe upon their right to free speech under the First Amendment

4

because it "in no way restricted their ability to circulate petitions or otherwise engage in political speech.").

The First Amendment is very concerned with a regulation that would make it more challenging to circulate petitions and collect the required number of signatures, or chill voter speech by somehow making a voter reluctant to sign a petition they otherwise might. Regulations of the petition circulation process often both restrict speech and make it more difficult to place the measure on the ballot. If a given regulation makes circulation more difficult *because* it restricts petition circulation and, thus, the speech associated with circulation activities, the First Amendment requires that the regulation pass exacting scrutiny.

The petition filing deadline and circulation period restrict speech by making it "less likely that [plaintiffs] will garner the number of signatures necessary to place the matter on the ballot, thus limiting their ability to make the matter the focus of statewide discussion." Meyer v. Grant, 486 U.S. 414, 423 (1988). A long filing deadline also restricts the amount of speech and discussion that will surround a proposed initiative because circulation activities will be far removed from the time of the election. The circulation period also restricts the sheer quantity of speech surrounding petition circulation because only a single year of circulation is allowed.

"[T]his case involves a limitation on political expression subject to exacting scrutiny." Meyer, 486 U.S. at 420. "[The State]'s burden is to show, at a minimum, that the law has a 'substantial relation[ship]' to a 'sufficiently important governmental interest." Calzone v. Summers, 942 F.3d 415, 423 (8th Cir. 2019), citing Minn. Citizens Concerned for Life, Inc. v. Swanson, 692 F.3d 864, 874–75 (8th Cir. 2012). That said, "States allowing ballot initiatives have considerable leeway to protect the integrity and reliability of the initiative process, as they have with respect to election processes generally." Buckley, 525 U.S. at 191. "[N]o litmus-paper test' will separate valid ballot-access provisions from invalid interactive speech restrictions; [the Supreme Court has] come upon 'no substitute for the hard judgments that must be made." Id. at 192 (quoting Storer, 415 U.S. at 730).

5

Petition signature filing "deadlines far before election day are problematic because of the general disinterest of potential voters so far removed from elections." Libertarian Party of Arkansas v. Thurston, 962 F.3d 390, 400 (8th Cir. 2020) (writing in the context of petition filing deadlines for minor party candidates to have their name placed on the statewide election ballot).

> An early filing deadline may have a substantial impact on independent-minded voters . . . [I]ssues simply do not remain static over time. . . It also burdens the signature-gathering efforts of independents who decide to run in time to meet the deadline. When the primary campaigns are far in the future and the election itself is even more remote, the obstacles facing an independent candidate's organizing efforts are compounded. Volunteers are more difficult to recruit and retain, media publicity and campaign contributions are more difficult to secure, and voters are less interested in the campaign."

Thurston, 962 F.3d at 400 (quoting Anderson v. Celebrezze, 460 U.S. 780, 791–92 (1983)).

Those same concerns about early filing deadlines affecting minor party candidates apply to the sponsors of ballot initiatives. Issues do not remain static over time; rather they shift and change with elections and legislative cycles. An issue that is particularly topical might not be eligible for placement on the statewide election ballot until years later under SDCL 2-1-1. If a sponsor decides to put forth an initiative, say six-months prior to an election, that sponsor would have to wait until an election two and a half years later to see the measure put to the vote or see the Secretary of State simply reject the petitions as untimely. All signatures would have to be collected during the year directly following a general election, the time when voters are most tired of politics and many are outright hoping for a break.

The remoteness in time from the petitioning period to the election also affects other aspects of the petitioning process. Volunteer circulators are more difficult to recruit and retain and financial contributions are more difficult to secure. Lastly, voters (only registered voters are eligible to sign ballot initiative petitions) are less interested and less politically engaged at times so far removed from the general election and may be less interested in hearing what petition circulators have to say about a given issue. These

6

individual burdens combine to make it less likely that a given measure will garner enough support to be placed on the ballot and, consequently, less likely that the subject of said measure will become a statewide topic of political discourse.

Having established the burden that the filing deadline and circulation window places on initiative circulators, the Court must turn to the question of the State's interest in efficient administration of the law and election integrity. While it is true that the state only reviews a very small sample of the submitted signatures, it would likely do much more if it found any substantial number of fraudulent signatures. If the sample reviewed by the State were to return only valid signatures, then surely their work would be very simple. If, however, some significant number of fraudulent signatures were discovered, surely a more exhaustive review would be undertaken, requiring more time and money. The State must also deal with the simple administrative tasks of formatting the ballots for printing and distribution. Each task could involve errors which would then need to be corrected. The State has more requirements than the filing deadline and circulation window. All of the monitoring procedures it has in place certainly require some time limitations in order to implement successfully. In short, some filing deadline is clearly necessary for the State to have time to complete its work surrounding ballot measures and the election itself.

In upholding the six-month window contained in Colorado's petition circulation law, the Tenth Circuit panel focused on the state's interests including preserving the integrity of its elections and maintaining an orderly ballot. See Am. Const. L. Found., Inc. v. Meyer, 120 F.3d 1092, 1099 (10th Cir. 1997), aff'd sub nom. Buckley, 525 U.S. at 191. "The regulation here advances these interests by establishing a reasonable window in which proponents must demonstrate support for their causes. The six-month deadline is a reasonable, nondiscriminatory ballot access regulation; it does not offend the First and Fourteenth Amendments." Id. The Supreme Court in Buckley subsequently approved of the Tenth Circuit's decision concerning the six-month circulation period. However, the deadline in Buckley was much closer to the election. Petition circulators had six months from the approval of the initiative text to circulate the petitions, but that

7

circulation period could end as late as three-months before the election at which the initiative would receive a vote. See COLO. REV. STAT. ANN. § 1–40–108(1) (West). Thus, under the Colorado scheme, some of the concerns about the quality of speech associated with circulating a ballot measure petition are abrogated.

The lower court decision in the Buckley case was primarily concerned with the six-month circulation window in the Colorado law. See Meyer, 120 F.3d at 1099–1100. While the Tenth Circuit often referred to the circulation window as a deadline, plaintiffs in that case were concerned with the length of time they had to circulate petitions, not the fact that the petitions had to be turned in at least three months before the election at which the measure would receive a vote. While the Buckley filing deadline and circulation period appear more restrictive than South Dakota's, they balance the differing constitutional concerns well. While six-months is a much shorter period than one-year, three months before the election is very near in time. Voters and circulators will be most energized during the six-month circulation period, thereby maximizing the chances of any issue receiving statewide discussion and focus. In that way, the Colorado scheme accounted for the Eighth Circuit's concerns in Thurston.

The South Dakota filing deadline for ballot measure petitions does not strike an appropriate balance as required by the First Amendment. While the circulation window is certainly long enough, it is too far removed from the time of the election at which the proposed measure would receive a vote. The State has no answer to those concerns. First, at trial, Kea Warne, then Director of Elections of the Secretary of State's office, testified that the Secretary's office had always managed to comply with the earlier deadline, which was, prior to 2009, in May then later in April of the election year.[2] The April and May deadlines still gave the Secretary of State's office the better part of six to seven months to review petition signatures and verify that all of South Dakota's legal

---

[2]   At trial, Ms. Warne responded, under cross-examination, that the deadline to file a petition prior to 2009 was in June of the election year.  The Court has found that the statement, which was in the context of agreeing with what was said by plaintiff's counsel, was incorrect.  From 1989–2006 the deadline to file a ballot measure petition was the first Tuesday in May during the year of the election.  See SDCL §2-1-2 (repealed, 2012 S.D. Laws Ch. 18 (SB 70)).  In 2006, the law was amended to make the deadline the first Tuesday in April of the election year.  Finally, in 2009 SDCL § 2-1-2 was repealed entirely and the one-year deadline was added to SDCL §§ 2-1-1.1 and 2-1-1.2.

requirements for ballot measure petitions had been followed. Ms. Warne testified that the Secretary's office had never had any trouble complying with any prior deadline, and that it usually took about two days to verify the sample of submitted petition signatures. Trial Transcript at 124–25.

The State's interest in administrative efficiency and maintaining a secure and accurate ballot are valid state interests. The Secretary's office must have deadlines and time periods within which to monitor these political processes and ensure legal compliance on the part of petition circulators. The State must also have time to construct a ballot. But those deadlines cannot be so long as to severely burden speech and limit the amount of political discourse on a matter of public concern. The First Amendment is primarily concerned with discourse. Discourse requires a balance between the needs of the State to maintain the integrity and efficiency of its election processes and the rights of citizens to circulate and sign petitions expressing their political viewpoints. The one-year filing deadline is simply too far removed from the election on the ballot of which the proposed measure would receive a vote. Like the Colorado law, a balance must be struck by South Dakota. The United States Constitution requires it.

In Colorado the circulation period was six months, and the filing deadline was three months before the election. South Dakota's circulation period is one year. In order to remain proportional and account for the difficulties and speech restrictions that come with petition filing deadlines long before the election, the First Amendment requires a filing deadline no earlier than six months before the election. Thus, a ballot initiative petition filing deadline in May would be sufficient to pass Constitutional muster.

The backbone of this decision is the balance of constitutional considerations with the State's legitimate interests in free, fair, and organized elections. Six months gives the Secretary of State's office more than adequate time to do the work that must be done. The State's interests in securing and organizing its elections are well served by a six-month filing deadline and the Secretary's office has had no trouble complying with that deadline for many years. There is nothing in the record that even suggests that the one-

year requirement lends anything of value to the State. In short, there is no reasonable basis for it.

Plaintiffs are severely burdened by a one-year filing deadline. Plaintiffs will have a great deal of trouble raising the level of public discourse concerning their proposed ballot measures so far removed from the election at which the measure will receive a vote. Issues, as has been said, do not remain static over time. Ballot initiatives are often referential, responding to the actions of the Legislature and other public officials. A given measure might be quite topical and when so removed from an election, there is little that could be done about it under the current scheme. Additionally, there will be less interest from potential circulators and, thus, less petition circulation, which also means a great deal less speech. There will be less interest from potential donors, which results in less petition circulation. The State's interests do not even come close to justify this diminution in political discourse.

The balance of rights and interests reverses for the filing deadline for petitions to amend the state constitution. Amending the state constitution is an altogether different proposition than an initiated measure. First, the stakes, as it were, are much higher. Once passed, constitutional amendments cannot be undone, except by further constitutional amendments. Additionally, the one-year filing deadline for an initiative based constitutional amendment is contained in the text of the South Dakota constitution itself. Article XXIII, § 1 of the South Dakota Constitution has contained the one-year filing deadline for petitions seeking to amend the state constitution since 1972. The fact that the voters felt that a one-year deadline was necessary to secure it is eminently reasonable.

Secondly, constitutional amendments are less likely to concern matters that are politically in vogue. The State Constitution is the government's cornerstone. Those seeking to amend the state constitution are not likely to decide to do so based on a political whim, but rather after careful consideration, more removed from political trend. Because of that, there is less need for concern that the general political interest might

wane during a circulation period far removed from the election at which it will receive a vote.

Finally, while not argued by the state, South Dakota has an interest in ensuring that its Constitutional amendments are well thought out, and that there is a significant amount of time to verify that all legally mandated procedures for filing such a petition have been followed. In short, South Dakota's interests in fair, legal, and well-run elections are at their zenith when a constitutional amendment is at stake. Those interests, combined with the state's interest in the integrity of its Constitution are compelling, and the one-year filing deadline for Constitutional amendment petitions passes exacting scrutiny.

In the interest of transparency, I state that I was appointed in the 1970's to the Constitutional Revision Commission by the then Chief Justice of the South Dakota Supreme Court. I served as a member of that Commission for several years. United States District Judge Lawrence Piersol was also a member of that Commission. We wrote and submitted, first to the Legislature and then to the people, a plethora of proposed amendments, all of which were adopted in state-wide elections.

## II.

The final question before the Court concerns the remedy. "In crafting an appropriate remedy, the Court seeks to go no further than necessary to address the constitutional wrong supported by this record." Gerlich v. Leath, 152 F. Supp. 3d 1152, 1180 (S.D. Iowa 2016) (citing Rogers v. Scurr, 676 F.2d 1211, 1214 (8th Cir. 1982); Coca-Cola Co. v. Purdy, 382 F.3d 774, 790 (8th Cir. 2004)). The first step to fashioning a remedy is to determine whether or not the unconstitutional one-year filing deadline contained in SDCL 2-1-1.2 can be severed from the remaining text of the law.

"Severability is of course a matter of state law." Leavitt v. Jane L., 518 U.S. 137, 139 (1996). In South Dakota, severability of unconstitutional statutory provisions can be summarized thusly:

> Unconstitutional provisions of a statute may be extracted and the remainder left intact. State ex rel. Wieber v. Hennings, 311 N.W.2d 41 (S.D.1981).

11

> The "doctrine of separability" requires this court to uphold the remaining
> sections of a statute if they can stand by themselves and if it appears that
> the legislature would have intended the remainder to take effect without the
> invalidated section. <u>Hogen v. South Dakota State Board of Transportation</u>,
> 245 N.W.2d 493 (S.D.1976).

<u>S. Dakota Educ. Ass'n/NEA By & Through Roberts v. Barnett</u>, 1998 S.D. 84, ¶ 32, 582

N.W.2d 386, 394, citing <u>Simpson v. Tobin</u>, 367 N.W.2d 757, 768 (S.D.1985).

In this case, it is only the initiated measure filing deadline contained in SDCL 2-1-

1.2 that has been found to offend the First Amendment.  A particular deadline, while

necessary to the implementation of the initiative procedure, is not so integral to the whole

operation of the statue that its removal must doom the remainder of SDCL 2-1-1.2.  A

deadline is necessary, but the particular deadline of November in the year before the

election at which the proposed measure will receive a vote is not necessary to the proper

functioning of the remainder of the statute's regulatory scheme.  Whether the deadline is

in November of the year before the election or several months later, SDCL 2-1-1.2's

regulatory scheme still functions and still makes logical sense.

Thus, the Court finds that the deadline is severable but that cannot end the matter.

The final question is whether the Court must, or may, fashion a new deadline for SDCL

2-1-1.2.  I must always keep in mind that I am not the Legislature and I do not write laws.

The South Dakota Constitution reserves the right to initiative and referendum to

the people.  That right remaining, the South Dakota Legislature would surely not want to

have the implementing legislation of those constitutional provisions struck down entirely

just to save a particular deadline that is not in any way necessary to the remainder of the

statute's regulatory scheme.  Additionally, the Legislature would not want the regulatory

scheme to function without some deadline.

The State is certainly entitled to pick a deadline of its choosing, so long as that

deadline is in line with the First Amendment.  The State would not want the statute to

remain in place without a deadline.  Plaintiffs must also be granted the relief to which

they are entitled.  If one year before the general election is too remote in time, some date

must still be fixed.  If plaintiffs are to have relief and the state's regulatory scheme is to

function the Court must fashion a new deadline that represents the constitutional limit. That limit must be arbitrary to some extent, as all deadlines are, but it must also be tied to law and logic.

Prior to 2006 the State imposed a deadline of the first Tuesday in May of the year of the election at which the proposed measure is to receive a vote. That deadline was contained in SDCL 2-1-2 before it was repealed. But SDCL 2-1-2's deadline stood from 1989 to 2006, when the deadline was moved one month earlier, to April. See S.D. Senate Bill 47 (enacted: March 1, 1989); S.D. Senate Bill 78 (enacted: February 15, 2006). These deadlines worked just fine.

"'When a law is found unconstitutional, it is void from its inception and the prior law remains in effect.'" Homestake Mining Co. v. South Dakota Subsequent Injury Fund, 644 N.W.2d 612, 618 (S.D. 2002) (quoting In re Certification of Questions (Knowles), 544 N.W.2d 183, 204 (S.D. 1996) (superseded by statute on other grounds)). Having already addressed why the First Amendment requires the State to hold a filing deadline no earlier than six months before the election, the deadline that was in effect from 1989 to 2006 must be reinstated. S.D. Senate Bill 78, enacted in 2006, which required a deadline seven months prior to the election is constitutionally inadequate. Thus, the deadline prior to S.D. Senate Bill 78, which was the first Tuesday in May during the year of the election, remains in effect.

The Court finds that the filing deadline, the requirement that the petition signatures be submitted at least one year before the election at which the measure would receive a vote, contained in SDCD 2-1-1.2 is severable from the remainder of the statute and that a new deadline of no sooner than six-months before the election at which the proposed measure is to receive a vote is proper.

As a final note, this Court understands that by leaving the remainder of SDCL 2-1-1.2's language intact the circulation window is effectively being increased to eighteen months. The Court has sought to craft relief that is as minimal as possible and, so, will not attempt to amend the language of SDCL 2-1-1.2 to remove the filing deadline and substitute another deadline. Obviously, the Court has approved of a one-year circulation

period in this opinion, but because of the way SDCL 2-1-1.2's statutory language creates the circulation window and deadline, that change effectively increases the circulation window. That is, because the language reading "no signature may be obtained more than twenty-four months preceding the general election that was designated at the time of filing of the full text" will be left undisturbed and the circulation window will effectively be eighteen months now that the filing deadline is set at six months before the general election. SDCL 2-1-1.2. This opinion has sought to provide relief that sets constitutional boundaries that are reasonable and fair to the rights and obligations of both parties.

The Court expresses no opinion on whether some other circulation window may be set by the Legislature. The Court has held that the one-year circulation window that existed in SDCL 2-1-1.2's regulatory scheme before the issuing of this opinion is constitutional. The Court also holds that a filing deadline of six months before the election at which the initiative would receive a vote is the constitutional limit for how remote a deadline may be set from the election. Now, therefore:

IT IS HEREBY ORDERED that the filing deadline for ballot initiative petitions contained in SDCL 2-1-1.2 of "at least one year before the next general election" is unconstitutional and unenforceable.

IT IS FURTHER ORDERED that Steve Barnett, in his official capacity as Secretary of State of the State of South Dakota, Jason Ravnsborg, in his official capacity as Attorney General of the state of South Dakota, and Kristi Noem in her official capacity as Governor of South Dakota and their officers, agents, servants, employees, attorneys, and all other persons in active concert or participation with them, are permanently enjoined from carrying out, implementing, and enforcing the filing deadline for ballot initiative petitions contained in SDCL 2-1-1.2 of "at least one year before the next general election," in accordance with this Memorandum Opinion and Order.

IT IS FURTHER ORDERED that the filing deadline for ballot measure initiatives under SDCL 2-1-1.2 is to be the first Tuesday in May during the year of the election This was the law from 1989 to 2006 and served the voters and the State perfectly well.

DATED this 30th day of August, 2021.

BY THE COURT:

CHARLES B. KORNMANN
United States District Judge

15